# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Orin Snyder
Direct: +1 212.351.2400
Fax: +1 212.351.6335
OSnyder@gibsondunn.com

Client: 43569-00046

July 11, 2018

VIA ECF

Hon. Jed S. Rakoff
United States District Court for the Southern District of New York
500 Pearl Street, Room 1340
New York, New York 10007

Re:     *David's Bridal, Inc. v. Infor (US), Inc.*, No. 18-cv-4349-JSR (S.D.N.Y.)

Dear Judge Rakoff:

In accordance with directions received from Your Honor's Law Clerk by telephone on July 9, 2018, Defendant Infor (US), Inc. ("Infor") respectfully submits this letter to demonstrate that the Amended Complaint ("AC") filed by Plaintiff David's Bridal, Inc. ("DB") should be dismissed for the reasons stated in Infor's motion to dismiss the original Complaint, ECF Docs. 15-17, as supplemented by this letter.[1]  Rather than remedy any of the Complaint's pleading deficiencies or assert any new viable legal theories, the AC only confirms that DB's gripes are not the stuff of legitimate contractual grievance—let alone the stuff of fraud.  DB seeks to hold Infor liable for $10+ million for alleged contractual and tortious offenses relating to a multi-year software licensing deal, yet it fails to identify any contractual provision that Infor supposedly breached.  Rather, it vaguely claims that Infor breached unspecified "obligations" under the agreements, and alleges an implausible "fraud" concerning its consent to assignments of the agreements that Infor supposedly either procured through misrepresentation or failed to obtain—even though the agreements expressly state that DB's consent was not required for any such assignment.  These new allegations add nothing to DB's insufficient claims.  The AC should therefore be dismissed.

## I.      The AC's New Allegations

DB originally asserted claims against Infor and its predecessor Starmount for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and fraud based on alleged failures to deliver to DB, and to support, a customized software system pursuant to Defendants' alleged obligations under the MSA.  Three days after Infor moved to dismiss, DB filed the AC.  The AC withdrew DB's claims against Starmount (which no longer exists after its merger into Infor) but did not withdraw any of the substantive claims or theories advanced in the Complaint.  Nor did the AC materially add to or alter any of DB's allegations supporting those theories.  Instead, the AC asserted (1) a new contract claim charging that Infor breached the License and Support Agreements by failing to support the Mobile POS System and failing to seek DB's consent to an assignment of those agreements to Infor; and (2) a new fraud theory alleging that Infor misrepresented the structure of its planned merger with Starmount by claiming that Starmount would continue as a surviving legal entity, rather than being merged into Infor.

---

[1]  Capitalized terms not defined herein are used as defined in the AC or in Infor's memorandum of law in support of the motion to dismiss, ECF Doc. 16 ("Mem.").  Citations to "Ex. __" are to exhibits to the Herrmann Declarations accompanying Infor's motion and this letter.  The AC is attached as Ex. 5, and a redline comparing the AC and Complaint is attached as Ex. 6.

**GIBSON DUNN**

## II.     The AC Fails to Remedy the Defects That Compel Dismissal of DB's Initial Claims

DB continues to advance the four claims it asserted in its initial Complaint, but the AC fails to remedy any of the defects that compel dismissal of those claims.  *See* Mem. at 10-25.

*First*, DB's claim for breach of the MSA remains both time-barred and insufficiently pleaded. *Id.* at 10-14.  DB apparently seeks to avoid dismissal on limitations grounds by alleging that the "timeline" Starmount and DB "agreed to" for delivery of the Mobile POS System was agreed only "orally and "informally."  AC ¶ 29.  That claim is not only improper—DB cannot "'advance one version of the facts in its pleadings'" and then, after "'conclud[ing] that its interests would be better served by a different version,'" simply "'amend its pleadings to incorporate that version,'" *Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 129 (S.D.N.Y. 2017) (quoting *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984))—but also unavailing.  Even if DB could now argue that any informal agreement as to timeline was not a binding term of the MSA, it cannot plausibly dispute that the breach it alleges occurred no later than October 2016, when Infor delivered the Mobile POS System pilot program that DB contends "did not function effectively" and "never provided the functionality DB contracted for," and when it "reneged on its false representations" about providing a system architecture with a "customization layer" and "refused to deliver what DB purchased."  AC ¶¶ 48, 60.  The AC confirms that DB's MSA breach claim accrued more than a year before this action was filed, rendering it time-barred.  Ex. 3 § 20(a).

The AC also fails to overcome DB's failure to identify any specific provision of the MSA that Infor allegedly breached.  Mem. at 13-14.  Rather, it merely tacks on an allegation that several SOWs "set[ting] forth in detail the technical specifications . . . DB contracted for," and "detailing the services Starmount . . . agreed to provide," were "incorporated into the MSA."  AC ¶¶ 22-24. That comes no closer to identifying a specific breach of the MSA than the Complaint did.

*Second*, the AC adds nothing to DB's original good-faith and unjust-enrichment claims, which must be dismissed as time-barred and duplicative of the MSA breach claim.  *See* Mem. at 14-18.

*Third*, the AC fails to salvage DB's flawed original fraud theory based on alleged misstatements that Infor was "committed to developing, delivering and supporting the Mobile POS System" and that its acquisition of Starmount would "benefit DB in the form of additional . . . resources." AC ¶¶ 37-38, 44-45.  At best, DB seeks to bolster that claim with an even more vague allegation that Infor also misrepresented that it "had the technical capability to" meet Starmount's alleged commitment.  *Id.* ¶ 44.  But that allegation adds nothing, because "[a] contracting party's representations about its resources" merely "underscore [that party's] purported intention and ability to perform the contract" and, as such, "are simply part and parcel of the intention to perform."  *C3 Media & Mktg. Group, LLC v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 432 (S.D.N.Y. 2005) (quotation omitted); *see Crabtree v. Tristar Auto. Group, Inc.*, 776 F. Supp. 155, 163 (S.D.N.Y. 1991) (dismissing fraud claim based on statements that defendants "possessed the expertise and resources" to operate a business).  Moreover, these new allegations are no less duplicative of DB's contract claim than the original fraud allegations are, because the MSA expressly warranted that support services would be performed by "qualified" personnel in "conformance" with the parties' agreements and standards "applicable to the information technology consulting industry."  Ex. 3 § 8(a); *see, e.g.*, *Kriegel v. Donelli*, 2014 WL 2936000, at *14 (S.D.N.Y. June 30, 2014) (dismissing fraud claim based on misstatement that was

**GIBSON DUNN**

duplicative of contract warranty).  DB's new allegation does not alter any of the underlying deficiencies that compel dismissal of this fraud theory.  *See* Mem. at 18-22.

### III.  Plaintiff's New Contract Claim and New Fraud Theory Are Both Fatally Flawed

**Claim for Breach of the License and Support Agreements.**  DB claims Infor breached these agreements by (1) failing to "seek DB's consent to the assignment of" those agreements from Starmount to Infor, and (2) "failing to provide adequate support services."  AC ¶¶ 6, 54, 75.  In the first instance, that claim fails for the same reason as DB's MSA breach claim:  DB fails to cite *any* contractual provision that allegedly was breached.  *See* Mem. at 13-14.  In any event, neither theory of breach could support an actionable claim for several basic reasons.

*First*, DB's breach claim premised on the alleged failure to secure its consent to an assignment of the License and Support Agreements is based on a fatal misunderstanding of the law governing assignments in the context of merger transactions, the applicable contractual provisions, and the structure of Starmount's merger with Infor.  DB alleges that Infor acquired Starmount in July 2016, AC ¶ 4; at that time, Starmount merged with an Infor subsidiary, effective August 1, 2016, with Starmount emerging as the surviving entity and a wholly-owned subsidiary of Infor (a so-called reverse triangular merger).  *See* Ex. 10.  Because Starmount survived that transaction, no assignment or transfer of its agreements occurred at that time.  Starmount later merged into and became part of Infor, effective December 31, 2016.  *See* Ex. 2.  DB objects to the latter event—perhaps not realizing that the former even occurred—but cannot premise any breach claim on it because, "[u]nder New York law, merger of a subsidiary into a parent does not necessarily constitute an improper assignment."  *J&R Elecs. Inc. v. Bus. & Decision N. Am., Inc.*, 2013 WL 5203134, at *10 (S.D.N.Y. Sept. 16, 2013) (citing *Brentsun Realty Corp. v. D'Urso Supermarkets, Inc.*, 182 A.D.2d 604, 605 (2d Dep't 1992)).  DB's claim also fails based on the plain language of the relevant contracts, which both provide that "[n]o consent shall be required" when an assignment "is to an Affiliate of the Party" or "involves the sale of all or substantially all of a Party's assets."  Ex. 7 § 8(a); *accord* Ex. 8 § 9(i).  Any assignment that might be deemed to arise out of Starmount's merger into Infor would constitute *both* an assignment to an "Affiliate" of Starmount (i.e., Infor, its corporate parent) and an assignment that "involves" the sale of all of Starmount's assets (i.e., the acquisition transaction).  Thus, no breach could arise from any alleged failure to obtain DB's "consent" to assignment of those agreements.

DB also cannot plausibly allege that it suffered damages as a result of any alleged transfer of the License Agreement or the Support Agreement to Infor.  *See Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action . . . .").  DB merely alleges that Starmount failed "[f]rom the outset" to perform its obligations under the parties' agreements, that it later "merged into Infor" but failed to "seek DB's consent" for an assignment of the License and Support Agreements to Infor, and that the combined Infor/Starmount entity thereafter "continued to breach" its obligations to DB.  AC ¶¶ 6, 35, 52, 54.  The AC thus fails to allege any facts establishing, or even plausibly suggesting, that DB's claimed damages were caused by any failure to seek consent to the merger.  *House of Europe Funding I, Ltd. v. Wells Fargo Bank*, 2014 WL 1383703, at *11 (S.D.N.Y. Mar. 31, 2014) (dismissing contract claim for "fail[ure] to plead any facts showing that [plaintiff] suffered any damages from the alleged breaches").

**GIBSON DUNN**

*Second*, DB's "support services" theory fails to state a claim for breach of the License or Support Agreements. To begin with, the License Agreement is just that—a conveyance of a software license, not a support contract—and it does not purport to impose any support obligations (in fact, it notes that the license is "not contingent upon" DB maintaining a Support Agreement, Ex. 7 § 2(b)).  DB cannot seriously dispute—and, in fact, appears to concede—that its support allegations are not actionable under the License Agreement.  *See* AC ¶¶ 5, 55, 60.[2]  DB's support theory is not actionable under the Support Agreement, either.  The crux of DB's case is that DB contracted for a "customized version of the standard mobile POS system" featuring a "unique mobile POS architecture" that "Starmount had developed from the ground up[,] . . . which DB could . . . overlay with customized code" in order to "utilize the unique applications" DB had developed. *Id.* ¶¶ 2, 19-20.  It is that "unique" and "customized" architecture—dubbed the "Mobile POS System," *id.*—that DB alleges Infor failed to support, *see id.* ¶¶ 5, 55, 57-58, 60. But nothing in the Support Agreement obligates Infor to provide support for the "unique" and "customized" Mobile POS System that is the subject of DB's claims.  Rather, the Support Agreement merely required Infor to provide services in respect of certain defined "Starmount Software," Ex. 8 § 2—which comprises only three "standard" Starmount products (known as Engage, Connect, and Enact) and "does not include custom code, extensions, or Client's integrations to third-party software or hardware," *Id.* § 1(a); Ex. 7 attach. B; Ex. 9 § 3.1.  The Agreement further provides that Infor's support obligations "do not cover configuration of Starmount Software to third party software or hardware, software customizations, extensions, hardware, operating systems, networks, Firmware, or Client's third party software."  Ex. 8 § 3(a).  Thus, DB's claim for breach of any obligation in the Support Agreement to support DB's "customized" Mobile POS System is foreclosed by the express terms of the very contract on which it is based.  *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2013) ("[W]here a conclusory allegation in a complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.").[3]

**Spurious new fraud theory.**  DB's new fraud theory also fails.  DB claims Infor committed fraud by representing (truthfully, *see* Ex. 10, despite DB's contrary allegations) that its August 2016 acquisition of Starmount would be structured as a reverse triangular merger and Starmount would survive it as a separate legal entity, which allegedly was a "material inducement" for DB to consent to an assignment of the MSA to Infor "because it reassured DB that Starmount would remain the face of the project and . . . remain dedicated to the project following the transition to Infor."  AC ¶ 40.  Leaving aside the factual accuracy of that alleged "misrepresentation," DB's fanciful theory fails on virtually every required element for pleading a fraud claim.

*First*, DB fails to allege any plausible misstatement of fact by Infor that could have been material to DB.  *See, e.g.*, *Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7, 9-10 (2d Cir. 2012).  DB now

---

[2]  Any claim for breach of the License Agreement must also be dismissed for failure to allege DB's compliance with the agreement's pre-suit dispute-resolution clause.  Ex. 7 § 7; *D&M Concrete, Inc. v. Wegmans Food Markets, Inc.*, 133 A.D.3d 1329, 1331 (4th Dep't 2015); *Laquila Constr., Inc. v. N.Y.C. Transit Auth.*, 282 A.D.2d 331, 331-32 (1st Dep't 2001).

[3]  Insofar as DB purports to expand its quasi-contract claims to parrot its breach allegations concerning the License and Support Agreements, AC ¶¶ 77-87, such claims are barred for the same reasons that bar the originally pleaded claims concerning the MSA.  Mem. at 14-16.

**GIBSON DUNN**

alleges that a promise of Starmount's corporate survival, and anticipated ongoing involvement in the project, was material to DB's decision to "consent" to assignment of the MSA to Infor.  AC ¶ 40.  But the thrust of its breach claims is that it suffered millions in damages from Starmount's total and "continuous[]" failure, arising "[f]rom the outset" of the relationship, to meet its contractual obligations.  *Id.* ¶¶ 31-33, 57-58.  Indeed, DB's original fraud theory is that it was induced to consent to the MSA assignment by false claims that Infor's acquisition of Starmount would "benefit DB in the form of additional . . . resources to support the project."  *Id.* ¶ 45.  DB cannot seriously claim, in the face of these allegations, that an alleged promise of Starmount's continued involvement was material to its decision to consent to the assignment.  Moreover, because the entirety of Starmount merged into Infor—transferring all assets and liabilities— DB's theory amounts to nothing but the untenable and immaterial assertion that DB somehow stood to benefit from its counterparty's continued use of the Starmount corporate name.

*Second*, DB's new fraud theory fails because DB could not have reasonably relied on any alleged representation that Infor's acquisition of Starmount would be structured as a reverse triangular merger, with Starmount surviving as a legal entity.  The MSA did not prohibit Starmount from being acquired by Infor, and it expressly *permitted* Starmount to assign its rights and obligations "to any person, firm or corporation controlled by, controlling or under common control of the assigning party *without the consent of the other party*."  Ex. 3 § 28 (emphasis added).  Moreover, it expressly provided that it "may not be modified or amended except by a written amendment signed by . . . both parties," and that its terms could not validly be waived "unless in writing . . . signed by the waiving party."  *Id.* §§ 22, 29.  Particularly given those express reservations, a sophisticated party such as DB could not reasonably or justifiably have relied on an alleged oral pledge to refrain from doing that which the MSA expressly permitted.  *See John St. Leasehold v. FDIC*, 1996 WL 737196, at *7 (S.D.N.Y. Dec. 24, 1996) ("Where a written agreement expressly bars oral modification of the agreement, a party cannot argue that it reasonably relied on an oral modification for purposes of establishing a fraud . . . claim."), *aff'd* 196 F.3d 379 (2d Cir. 1999).

*Third*, DB fails to allege facts supporting an inference of scienter for this theory.  Mem. at 20-21.

*Fourth*, DB fails to explain how any alleged misstatement about whether Starmount would be merged into Infor could have caused its alleged injuries.  *See, e.g.*, *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 255-56 (S.D.N.Y. 2012).  Starmount allegedly first failed to perform its obligations long before the merger, and the circumstances of the parties' relationship did not change following the merger, except insofar as the legal name of DB's contract counterparty changed.  The AC fails to allege any injury flowing from that inconsequential event.[4]

————

The AC should be dismissed for these reasons; because DB has already taken the opportunity to replead in response to Infor's motion, it should be dismissed with prejudice.  *E.g.*, *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 500 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003).

Respectfully,
 /s/ Orin Snyder

—————————

[4]  The AC also continues to demand recovery in an amount that far exceed the unambiguous contractual damage limitations set forth in the parties' agreements.  *See* Mem. at 22-25; Ex. 7 § 6(d); Ex. 8 § 8(a).  DB's claims are all barred to the extent that they seek such recovery.